33UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **Z.B.**, *et al.*,<br><br>                    **Plaintiffs,**<br><br>           **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>                    **Defendant.** | **Civil Action No. 15-1037 (ESH)** |

## MEMORANDUM OPINION

Plaintiffs, a minor child ("Z.B.") and her parents, bring this action against defendant District of Columbia ("the District").  The gravamen of their complaint is that the District of Columbia Public Schools ("DCPS") failed to provide Z.B. with a Free Appropriate Public Education ("FAPE"), as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, because DCPS failed to place Z.B. in a full-time special education program.  Based on this alleged violation of the IDEA, plaintiffs argue that they acted appropriately in unilaterally deciding to move their child out of the public elementary school that she had attended to a private school some two months after the first Individualized Education Program ("IEP") was prepared in June 2014, and second, that the January 2015 IEP erroneously concluded that she did not need a full-time special education program, but that the special education services available at DCPS were sufficient to meet her needs.  The issues before the Court are:  did defendant violate the IDEA by providing deficient IEPs that erroneously concluded that Z.B.'s special education needs could be met within DCPS, and if so, should the DCPS be ordered to reimburse plaintiffs for the costs incurred in sending Z.B. to a specialized

private day school for the 2014-2015 and 2015-2016 school years.  Based on the administrative

record, the Court concludes that plaintiffs are not entitled to the reimbursement that they seek.

## BACKGROUND

## I.    IDEA FRAMEWORK

"Under the Individuals with Disabilities Education Act (IDEA), every child with a

disability in this country is entitled to a 'free appropriate public education,' or FAPE." *Leggett v.

District of Columbia*, 793 F.3d 59, 62 (D.C. Cir. 2015) (quoting 20 U.S.C. § 1400(d)(1)(A)).[1]

"To guarantee that no child with a disability misses out on the education the Act promises, and to

ensure, in turn, that the education offered is 'appropriate,' [the] IDEA requires that school

officials develop a comprehensive strategy, known as an 'individualized education program,' or

IEP, tailored to the student's unique needs." *Id.* at 63 (quoting § 1414(d)(1)(A)).[2]  School

districts are required to "have an IEP in place for each student with a disability '[a]t the

beginning of each school year.'" *Id.* at 63 (quoting § 1414(d)(2)(A)).

In developing an IEP for a particular child, a school's IEP team must "(A) review

---

[1] The term "free appropriate public education" is defined as "special education and related
services that—

| (A) | have been provided at public expense, under public supervision and direction, and without charge; |
|---|---|
| (B) | meet the standards of the State educational agency; |
| (C) | include an appropriate preschool, elementary school, or secondary school education in the State involved; and |
| (D) | are provided in conformity with the individualized education program required under section 1414(d) of this title." |

20 U.S.C.A. § 1401(9).

[2] The term "individualized education program" is defined as "a written statement for each child
with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of
this title."  20 U.S.C. § 1401(14).

existing evaluation data on the child, including--(i) evaluations and information provided by the

parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-

based observations; and (iii) observations by teachers and related services providers . . . ." 20

U.S.C.A. § 1414(c)(1).  A completed IEP must include: "a statement of the child's present levels

of academic achievement and functional performance"; "a statement of measurable annual goals,

including academic and functional goals"; and "a statement of the special education[3] and

related services[4] . . . to be provided to the child, or on behalf of the child." 20 U.S.C. §

1414(d)(1)(A).  In addition, the IDEA requires that all services be provided in the "least

restrictive environment" appropriate for the student.  20 U.S.C. § 1412(a)(5)(A).[5]

　　　"'If no suitable public school is available, the [school system] must pay the costs of

---

[3] "The term 'special education' means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability . . . ." 20 U.S.C. § 1401(29).

[4] "The term 'related services' means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." 20 U.S.C. § 1401(26)(A).

[5] In full, § 1412(a)(5)(A) provides:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

sending the child to an appropriate private school.'" *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 519 (D.C. Cir. 2005) (quoting *Jenkins v. Squillacote*, 935 F.2d 303, 305 (D.C. Cir. 1991)).  In addition, "[a]lthough Congress envisioned that children with disabilities would normally be educated in 'the regular public schools or in private schools chosen jointly by school officials and parents,' it provided that parents who believe that their child's public school system failed to offer a free appropriate public education—either because the child's IEP was inadequate or because school officials never even developed one—may choose to enroll the child in a private school that serves her educational needs." *Leggett*, 793 F.3d at 63 (quoting *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993)).  A unilateral decision to remove a child from public school does not preclude reimbursement, but parents who take that step "do so at their own financial risk." *Sch. Comm. of Town of Burlington. v. Dep't of Educ.*, 471 U.S. 359, 374 (1985); *Florence Cty.*, 510 U.S. at 15.  "[I]f the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining reimbursement" because the student would have been offered a FAPE.  *Sch. Comm.*, 471 U.S. at 374; *see also* 20 U.S.C. § 1412(10)(C)(ii)); 34 C.F.R. § 104.33(c)(4).  Moreover, even if the student was denied a FAPE, parents must establish that the private school placement is "proper under the [IDEA]."  *Florence Cty.*, 510 U.S. at 15; *see Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009).  Once those two hurdles have been cleared, the reviewing court must determine if "the equities weigh in favor of reimbursement—that is, the parents did not otherwise act unreasonabl[y]." *Leggett*, 793 F.3d at 67; *see also Sch. Comm.*, 471 U.S. at 374 ("equitable considerations are relevant in fashioning relief").

## II.  FACTUAL BACKGROUND

Starting in pre-kindergarten, Z.B. attended Hearst Elementary School ("Hearst"), a D.C. public school.  Hearst was not Z.B.'s in-boundary school, but the school her parents selected

through the DCPS school lottery.  In March 2013, towards the end of second grade, Z.B.'s

parents brought her to Children's National Medical Center ("Children's") for a psychiatric

evaluation due to concerns about her "inability to focus."  (AR 76.)  She was diagnosed with

"attention deficit hyperactivity disorder combined type."  (AR 77.)  Shortly thereafter, on May 1,

2013, Z.B.'s therapist, Katherine Rettke, a licensed clinical social worker at Children's, asked

DCPS to consider adopting a "[Section] 504 plan"[6] in order to help Z.B. function better at

school.  (AR 81.)  She suggested a number of possible interventions that Z.B.'s teachers could

use in order to "reinforce on task behaviors and allow for frequent breaks to reduce some of her

hyperactive symptoms."  (AR 81.)  She also opined that "IEP testing may also be indicated in the

future in order to rule out any learning disabilities if improvement is not seen with 504 supports."

(AR 81-82.)  In May 2013, Hearst developed a 504 plan for Z.B., which provided that she would

receive preferential seating in class, be tested in a distraction-free environment, and receive

additional time on tests.  (AR 118, 222.)   In June 2013, Z.B.'s parents approved the 504 plan,

and it was implemented when Z.B. started third grade in August 2014.  (AR 85, 222.)

During the spring of Z.B.'s third grade year, due to ongoing social and academic issues,

Z.B.'s parents arranged for a neuropsychological evaluation of Z.B. by a licensed psychologist at

Children's, Jacqueline Sanz, Ph.D.  (AR 117.)  Dr. Sanz evaluated Z.B. on April 14, 2014, and

provided a final report to Z.B.'s parents on May 12, 2014.  (AR 117.)  Dr. Sanz reached the

following diagnostic conclusions: (1) that "inattention, impulsivity, and executive dysfunction"

---

[6] Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, prohibits programs
funded by the federal government, from discriminating on the basis of disability.  A Section 504
Plan "is designed to assist students with learning or behavior problems even if they do not
qualify for an Individualized Education Plan (IEP) under the IDEA." *Horne v. Potomac
Preparatory P.C.S*, No. 15-cv-115, 2016 WL 3962788, at *2 (D.D.C. July 20, 2016).

were "concerns" and that Z.B. met the "DMS-V diagnostic criteria for Attention

Deficit/Hyperactivity Disorder – Combined Presentation"; (2) that "math skills and written

expression" were "areas of weakness" and that her "problems [we]re consistent with a DSM-V

diagnosis of a Specific Learning Disorder, with Impairment in Mathematics, and a Specific

Learning Disorder, with Impairment in Written Expression"; and (3) that "reports of social-

emotional development indicated problems with anxiety, depressed mood, oppositional behavior,

and social skills." [7]  (AR 119-21.)  As summarized by Dr. Sanz:

> Z.B.'s neurocognitive profile presents a number of risks.  In particular, Z.B.'s
> weaknesses in attention and executive functioning place her at increased risk for
> academic difficulties, especially as demands continue to rise in the coming years.
> This is especially true in fourth and fifth grade, when demands on executive skills
> increase dramatically, while structures and supports found in earlier elementary
> classrooms are faded away. . . .  In other words, without additional support, Z.B.
> is at risk for falling behind grade level in multiple areas.  Lastly, Z.B.'s anxiety
> and mood dysregulation, in combination with executive dysfunction, leaves her
> susceptible to becoming quickly overwhelmed and may further contribute to
> academic challenges.  This combination of anxiety, mood dysregulation, and
> executive dysfunction may also contribute to her ability to engage socially with
> others, and has the potential to impact Z.B.'s self-esteem.  *Despite these risks,
> Z.B. has a number of strengths, and with additional supports is expected to do
> quite well.*

(AR 120-21 (emphasis added).)  Accordingly, Dr. Sanz recommended (1) that Z.B. be

"provid[ed] accommodations via an Individualized Education Plan (IEP) as a student with a

Specific Learning Disability" and to "[c]onsider an additional secondary coding of Other Health

Impairment"; (2) that "[w]ith respect to placement, Z.B. should receive specialized, small group

instruction for core subjects (e.g., math, language arts)" and "[f]or other subjects, Z.B. should be

---

[7] Dr. Sanz also described Z.B. as having a history of inattention, impulsivity, disorganization, and social difficulties, including having been verbally bullied at school since the first grade, and as having demonstrated improvement with regard to her reading skills during third grade, but as still having difficulty with math and writing.  (AR 118.)

placed in a classroom with a small teacher to student ratio and increased supports for her

symptoms of ADHD, and to accommodate for the impact of her learning disorder in these

settings (for example, co-taught classes)"; (3) that Z.B. should "receive specialized instruction to

help with organizational skills and task approach for all academic classes"; (4) that Z.B. "should

receive an occupational therapy evaluation and individual occupational therapy to address letter

reversals and weaknesses in written expression; (5) that Z.B. "should receive a speech-language

assessment to examine phonological awareness given challenges in written expression"; and (6)

that Z.B. "should meet with the school psychologist regularly as an additional support for

socioemotional needs within the school context."  (AR 121.)  Dr. Sanz also recommended that

Z.B.'s parents consider: (1) meeting with a child psychiatrist to discuss medication treatment of

ADHD; (2) cognitive-behavioral therapy to help with anxiety, mood, inattention and impulsivity;

and (3) an executive-skills coach or special education tutoring to address her impairment in math

and written expression, as well as skills affected by ADHD, possibly through the Lab School.

(AR 123.)

    Z.B.'s parents provided DCPS with the Sanz Report and requested that Z.B. be evaluated

for an IEP.  (AR 131, 144; 5/4/2016 Tr. at 254.)  Sara Tick, the school psychologist at Hearst,

was the person responsible for "discuss[ing] and apply[ing] the results from [the Sanz Report] to

the eligibility of special education services."  (5/5/15 Tr. at 35.)  An "initial eligibility meeting"

took place on May 27, 2014, and DCPS found Z.B. eligible for special education services as an

individual with the disability "Other Health Impairment / Attention Deficit Disorder."[8]  (AR

146.)

_____

[8] Tick later testified that DCPS did not find Z.B. eligible based on the specific learning
disabilities identified by the Sanz Report because of the report's emphasis on ADHD, but that

On June 9, 2014, Z.B.'s DCPS IEP team and Z.B.'s parents met to develop Z.B.'s initial IEP.[9]  (AR 412.)  The IEP team included Tick; Sharon Oliveros, Hearst's special education teacher; Elizabeth Wendt, the school counselor, acting in the role of social worker; Hearst's then-principal; and two of Z.B.'s third grade teachers.  During the meeting, Z.B.'s parents were informed that an IEP is a "fluid" document -- that things could always be added or taken away.  (5/4/2016 Tr. at 254.)  The initial IEP (the "June 2014 IEP") identified three "areas of concern" ("academic-mathematics," "academic-written expression," and "emotional, social and behavioral development") and authorized a total of 8.5 hours of "special education and related services," consisting of 7.5 hours per week of academic support and one hour per week of behavioral support services.[10]  (AR 414-18.)  As six of the service hours were to be "outside the general education setting," the IEP team was required to affirm, in the "least restrictive environment" section of the IEP, that Z.B. had "needs that require removal from general education," specifically that "[t]he nature and/or severity of the disability must be such that the student can only make progress on IEP goals and objectives by being removed from the general education classroom to receive these services."  (AR 419.)  Implementation of the June 2014 IEP started

she anticipated that there might be "future evaluations or information coming that we may have to change the classification to multiple or add other areas."  (5/5/15 Tr. at 35.)

[9] The IEP team also included: Hearst's then-principal, Deborah Bergeron; Z.B.'s third-grade general education teachers, Kathy Monaghan and Christina Brown; and the school counselor, Elizabeth Wendt (who, due to staffing shortages, was acting as the social worker (*see* 5/28/2015 Tr. at 132)).  (AR 412.)

[10] Specifically, the June 2014 IEP provided for special education in mathematics (one hour per day outside the general education setting) and written expression (30 minutes per day within the general education setting) and behavioral support services (one hour per week outside the general education setting).

the next day, but because Z.B. missed the last week of school to attend a summer camp, it was only in effect for four days before the school year ended.  (*See* 5/5/15 Tr. at 41.)

Z.B.'s parents did not express any disagreement with the June 2014 IEP at the meeting when it was adopted or request any changes thereafter.  (*See* 5/4/15 Tr. at 262.)  However, within a week or so after the meeting, they began to investigate alternative options, and they ultimately decided to apply to the Lab School, a private day school in D.C. devoted to educating students with learning disabilities.  (*See* 5/4/15 Tr. at 255.)  According to Z.B.'s father, they requested the recommendations they would need from Z.B.'s teachers in order to apply to the Lab School before the end of June and, at the same time, also told the principal and her administrative assistant that they were going to apply to the Lab School and that they would be asking for funding.[11]  (*See* AR at 164-65; 5/4/15 Tr. at 255-56, 265, 271-72.)  The next communication between Z.B.'s parents and Hearst took place on August 28, 2014, when Z.B.'s mother notified Hearst in a handwritten note that Z.B. was withdrawing from DCPS and would be attending the Lab School in 2014-15.  (AR 428.)

Z.B. began attending the Lab School in August 2014.  In October 2014, the Lab School produced its own IEP for Z.B. (the "Lab School IEP").  The Lab School's IEP differed from the June 2014 IEP in two material respects: (1) it added "reading" and "academic behavior/executive functioning" as two additional "areas of concern"; and (2) it called for 35 hours per week of specialized instruction and related services to be provided as part of a "self-contained, intensive, individualized, remedial special education program" such as provided by the Lab School.  The

---

[11] Z.B.'s father testified that they also provided a written notice to the same effect, but due to an unusual set of circumstances, the unexpected death of the administrative assistant and the principal's departure from Hearst, the school has no record of that communication.  (Hearing Officer Decision ("HOD") at 7 n.42; *see also* 5/4/15 Tr. at 256-57, 262-63.)

Lab School's IEP concluded that this was the "least restrictive environment" appropriate for Z.B.
because her "pervasive learning disabilities impede acquisition of academic skills and the ability
to learn and complete assignments in the general education curriculum." (AR 203, 216.)

In November 2014, while Z.B. was attending the Lab School, DCPS arranged for two
additional evaluations. First, Anita Hughes, a DCPS licensed clinical social worker, conducted a
"functional behavior assessment" ("FBA"), the general purpose of which is "to look at behaviors
that are interfering with the student's ability to be fully successful." (5/5/15 Tr. at 285-86.)
Specifically as to Z.B., the FBA was to further examine her "poor social skills, distractibility,
and mood dysregulation," which the June 2014 IEP had identified as an area of concern.[12] (AR
429.) Z.B.'s parents and teachers told Hughes that Z.B. was making "good academic progress"
at the Lab School, and Z.B.'s parents also reported that Z.B.'s "level of anxiety ha[d]
significantly diminished." (AR 224, 226.) However, Hughes found that although Z.B.'s
problem behaviors were "not as severe as in the past," they had "escalated since the start of the
current year" and "resulted in poor peer relationships and sometimes disrupt[ed] the academic
program." (AR 224, 226, 240.) Hughes further found that these behaviors "affect [Z.B.'s]
ability to access the general education curriculum on a consistent basis and can be disruptive for
her peers." Hughes recommended that the Lab School "develop and implement a comprehensive
behavior intervention plan" (AR 440), but her report expressed no opinion as to whether Z.B.'s
behavioral issues required placement in a full-time special education program. DCPS also
arranged for an "occupational therapy ["OT"] assessment" to evaluate Z.B.'s "current fine

---

[12] Hughes reviewed Z.B.'s file, conducted four classroom observations at the Lab School, and
spoke with Z.B.'s parents, two of her current teachers at the Lab School, the social worker at the
Lab School, two of Z.B.'s third-grade teachers at Hearst, and Tick. (AR 221-29.)

motor, visual motor, visual perceptual and sensory processing skills" and to determine "her need for school-based occupational therapy."  (AR 231.)  The OT assessment report described Z.B. as having various deficits that were "having an impact on her ability to consistently produce written work with good letter formation, spacing and line alignment."  (AR 235.)

After receiving the results of the FBA and the OT assessment, the DCPS IEP team drafted a revised IEP and then met, on December 12, 2014, for its "annual review" of Z.B.'s IEP. (AR 243.)  In addition to Tick, Oliveros, Wendt, Z.B.'s third grade general education teacher from Hearst, and Z.B.'s parents, all of whom were part of the June 2014 IEP meeting, the December meeting was attended by Hughes, Dwayne Lawrence, the OT evaluator, Kali McFarland, the new case manager from DCPS's central office, Claudia deSilva, another special education teacher from Hearst, and Z.B.'s parents' attorney.  (AR 243.)  After an initial discussion, it was agreed that the final IEP meeting would be deferred until after the parents' attorney submitted additional information from the Lab School.  (*See* 5/28/15 Tr. at 15.)

On December 19, 2014, plaintiffs' attorney sent DCPS their "input for the redrafting of the proposed IEP" (AR 259), which included notes from Dr. Jennifer Durham, the curriculum and technology coordinator at the Lab School, and a request that the revised IEP include additional information from the Sanz Report, Z.B.'s current teacher evaluations, Z.B.'s final third grade report card from Hearst, the FBA, and the OT assessment, and that it "include a section in the goals area on executive functioning."  (AR 259-61.)

When the DCPS IEP team met again, on January 20, 2015 (AR 472),[13] DCPS had further revised the IEP to (1) add "reading" and "motor skills/physical development" as "areas of

---

[13]All the same individuals were in attendance except for Z.B.'s mother.   (AR 472.)

concern"; (2) adjust some of the goals; (3) slightly increase the overall hours of special

education; and (4) in the section for "other classroom aids and services," state that Z.B. "requires

a precise system for organizing her school work and tracking assignments, such as color-coded

folders/notebooks and help writing assignments in an agenda." (AR 276.) According to the

official meeting notes, plaintiffs were satisfied with the additional revisions to the IEP with two

exceptions: (1) they wanted the IEP to include express executive functioning goals; and (2) they

believed that Z.B. required full-time special education, *i.e.*, placement at the Lab School or

another comparable private school. (AR 488-91.) DCPS explained that it generally did not treat

executive functioning as a separate "area of concern" (AR 489), but agreed to add executive

functioning goals to the "emotional, social and behavioral" area of concern. (AR 490.) On the

placement issue, there was an extensive discussion, with Dr. Durham from the Lab School

participating by phone and presenting her view that Z.B. required small groups for learning

because in large groups she struggles with behavior and the inability to complete independent

work, whereas Tick and Oliveros continued to be of the opinion that Z.B. could be educated

within DCPS. (AR 489-91.) Ultimately, plaintiffs' attorney indicated that unless the placement

decision was changed to provide Z.B. with full-time special education, the parents would reject

the IEP. (AR 490-91.) One other issue that was discussed was, if Z.B. were placed in DCPS,

whether Hearst would be an appropriate "location of services" given the troubles Z.B. had had

there in the past. However, Z.B.'s father indicated that he did not consider their local school an

appropriate alternative because it was a "failing school." (AR 491.)

The final IEP that DCPS produced after this meeting rejected Z.B.'s parents' request to

find that Z.B.'s disabilities required full-time special education, but it provided for a total of 11.5

hours of special education and related services, including 10 hours per weeks of academic

support, 1 hour per week of behavioral support services, and 30 minutes per week of

occupational therapy.  (AR 484.)  A total of 10.5 hours were to be outside the general education

setting,  (AR 484.)

## III.   PROCEDURAL BACKGROUND

On March 10, 2015, Z.B.'s parents filed a "due process complaint"[14] against DCPS,

claiming that both the June 2014 and January 2015 IEPs failed to provide Z.B. with a FAPE, and

therefore, that they were entitled to reimbursement for Z.B.'s attendance at the Lab School for

the 2014-15 school year and an order that DCPS place and fund Z.B.'s attendance there for the

2015-16 school year.  (AR 4-16.)  The IEP team and Z.B.'s parents met in a "resolution

session"[15] on March 24, 2015.  As a result of that meeting, DCPS agreed to alter the January

2015 IEP to add express executive functioning goals, which it did on April 20, 2015.  (AR 495,

509.)  The remaining issues were the subject of the "due process hearing" that took place on May

4, 5, and 28, 2015.[16]

At the hearing, plaintiffs presented testimony from four witnesses: Z.B.'s father testified

---

[14] Under the IDEA, a parent may file a due process complaint with the local educational agency "with respect to any matter relating to the identification, evaluation, or educational placement of [a child with a disability] or the provision of a free and appropriate public education to such child."  20 U.S.C. § 1415(b)(6)(A).

[15] The IDEA requires that before any due process hearing the IEP team and parents shall meet in a "resolution session."  20 U.S.C. § 1415(f)(1)(B).

[16] The IDEA provides that:

> Whenever a complaint has been received under subsection (b)(6) . . . , the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency.

20 U.S.C. § 1415(f)(1)(A).

about Z.B.'s experiences at Hearst and at the Lab School; Dr. Sanz, an expert in
"neuropsychology," testified about inconsistencies between her report and the June 2014 IEP;
Dr. Durham, an expert in "programming for and instruction of learning disabled and other-health
impaired students," testified about her knowledge of Z.B. from the Lab School and gave her
opinion that both the June 2014 and January 2015 IEPs were not appropriate; and Christine
Chang, an expert in "OT services," testified that Z.B.'s need for occupational therapy was
probably longstanding.  DCPS presented testimony from five witnesses: Tick, an expert in
"school psychology," testified about her role in developing the June 2014 and January 2015 IEPs
and gave her opinion that both were appropriate; Oliveros, an expert in "special education
programming, special education instruction, and determining special education services in the
least restrictive environment," testified that both the IEPs were appropriate; Hughes, an expert in
"clinical social work in a public school setting with emphasis on behavioral support," testified
about the FBA she conducted of Z.B.; Kali McFarland, who took over as the DCPS case
manager in the fall of 2014, testified about the events leading up to and the development of the
January 2015 IEP; and Wendt, the social worker from Hearst, testified about the development of
both the June 2014 and January 2015 IEPs.

The hearing officer issued her decision ("HOD") on June 9, 2015, ruling that plaintiffs
had failed to prove: (1) that DCPS denied Z.B. a FAPE by failing to propose an appropriate
program for her in the June 2014 and January 2015 IEPs; (2) that  DCPS denied Z.B. a FAPE by
failing to propose an appropriate placement for Z.B. for the 2014-15 school year, specifically by
failing to designate a full-time, separate day school as the "least restrictive environment"
appropriate for her; and (3) that DCPS denied Z.B. a FAPE by failing to propose an appropriate
location of services, specifically by inappropriately selecting Hearst as the location of services,

despite Z.B.'s previous negative experiences at the location that impacted her social and academic well-being.

On July 21, 2015, plaintiffs filed suit against the District of Columbia,[17] asking the Court to vacate the HOD, and find that both the June 2014 and January 2015 IEPs failed to provide Z.B. with a FAPE, either due to the placement decision or program content,[18] and to order DCPS to reimburse them for the cost of Z.B.'s attendance at the Lab School.[19] Relying on the existing administrative record, both parties have moved for summary judgment.  (*See* Pls.' Mot. for Summary Judgment, Sept. 25, 2016 [ECF No. 14]; Def.'s Cross-Mot. for Summary Judgment, Nov. 30, 2015 [ECF No. 15].)

## ANALYSIS

The parties' cross-motions for summary judgment present the following issues: (1) did the placement decision in either the June 2014 IEP or January 2015 IEP, specifically the decision to place Z.B. in DCPS and not in a private full-time special education setting such as the Lab School, result in an IEP that failed to provide Z.B. with a FAPE; (2) if not, were there substantive flaws in the program content of either IEP sufficient to result in a legally "inadequate" or "inappropriate" IEP that failed to provide Z.B. with a FAPE; and (3) if either

---

[17] The IDEA permits "any party aggrieved by the findings and decision" rendered during administrative proceedings to "bring a civil action" in state or federal court.  20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.512(b)(3).

[18] While extensively describing Z.B.'s history of problems at Hearst, plaintiffs do not appear to pursue their claim that DCPS also denied Z.B. a FAPE by designating Hearst as the "location of services."

[19] At the time the complaint was filed, plaintiffs were seeking reimbursement for Z.B.'s attendance at the Lab School for 2014-15 and placement there for 2015-16. As the 2015-16 school year has ended, the Court will treat plaintiffs' claim as one for reimbursement for both years.

IEP denied Z.B. a FAPE, are her parents entitled to reimbursement for her attendance at the Lab

School for the 2014-15 and 2015-16 school years.[20]

## I.    STANDARD OF REVIEW

A court reviewing a challenge to an administrative decision in an IDEA case is directed

to "receive the records of the administrative proceedings," to "hear additional evidence at the

request of a party,"[21] and, "basing its decision on the preponderance of the evidence, . . . [to]

grant such relief as the court determines appropriate."  20 U.S.C. § 1415(i)(2)(C)(i)-(iii); 34

C.F.R. § 300.512(b)(3).  The "'party challenging the administrative determination must at least

take on the burden of persuading the court that the hearing officer was wrong.'"  *Reid*, 401 F.3d

at 521 (quoting *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C. Cir. 1989) ("*Kerkam I*")).  As a

general rule, the reviewing court must give "due weight" to the hearing officer's determinations.

*Board of Education v. Rowley*, 458 U.S. 176, 206 (1982); *see also Reid*, 401 F.3d at 521

(explaining that statutory language of the IDEA "'plainly suggests less deference than is

conventional' in administrative proceedings" (quoting *Kerkam I,* 862 F.2d at 887)).  "'However,

"a hearing decision 'without reasoned and specific findings deserves little deference.'"  *Id.*

(quoting *Kerkam v. Superintendent, D.C. Pub. Schs.,* 931 F.2d 84, 87 (D.C. Cir. 1991) ("*Kerkam
II* ") (internal quotation marks omitted)).

In this case, plaintiffs contend that the HOD warrants little deference as it lacks a detailed

---

[20] As set forth in the complaint, the specific counts are (1) that DC failed to provide Z.B. with a
FAPE (Count I); (2) that DC failed to develop an appropriate IEP for Z.B. (Count II); and (3)
that the Hearing Officer committed error and violated plaintiffs' due process rights by failing to
render a proper decision based on an accurate and impartial understanding of the facts and by
failing to apply correct legal standards (Count III).

[21] Although the IDEA allows parties to introduce additional evidence, 20 U.S.C. §
1415(i)(2)(C)(i)-(iii), neither party has done so in this case.

and reasoned explanation of how the evidence supports its findings and conclusions.  While the

Court agrees, it can nonetheless decide the issues presented based on its own examination of the

record.[22]

## II.   LEGAL STANDARD FOR EVALUATING THE ADEQUACY OF APPROPRIATENESS OF AN IEP

Under the IDEA, "[a] public school district need not guarantee the best possible

education or even a 'potential-maximizing' one.'" *Leggett*, 793 F.3d at 70 (quoting *Rowley*, 458

U.S. at 197 n.21).  Rather, the purpose of the IDEA is to provide a "basic floor of opportunity."

*Id.* at 201.  With that in mind, the Supreme Court has held that an IEP satisfies the IDEA if it is

"reasonably calculated to enable the child to receive educational benefits."  *Id.* at 207; *see also*

*Reid*, 401 F.3d at 519 ("[T]he IEP must, at a minimum, 'provid[e] personalized instruction with

sufficient support services to permit the child to benefit educationally from that instruction.'"

(quoting *Rowley,* 458 U.S. at 203)).  "[A]n ideal or perfect plan is not required."  *Lessard v.*

*Wilton-Lyndeborough Coop. Sch. Dist.*, 592 F.3d 267, 270 (1st Cir. 2010).  Flaws in the content

of an IEP do not necessarily "invalidate the IEP as a whole."  *D.G. v. Cooperstown Cent. Sch.*

*Dist.*, 746 F. Supp. 2d 435, 448 (N.D.N.Y. 2010); *see S.M. v. Weast*, 240 F. Supp. 2d 426, 433

(D. Md. 2003) (court must determine "whether the omission from the IEP of certain specific

stated needs and goals or present performance levels is fatal to the document"); *see also Doe v.*

*Defendant,* 898 F.2d 1186, 1190 (6th Cir. 1990) (to invalidate an IEP based on technical

deviations from what the IDEA requires would be to "exalt form over substance").  "Ultimately,

---

[22] The Court does not find that the lack of reasoning in the HOD necessitates a remand. *Compare M.O. v. District of Columbia*, 20 F. Supp. 3d 31 (D.D.C. 2013) (remand necessary) *with Anderson v. District of Columbia*, 606 F. Supp. 2d 86, 90 n.1 (D.D.C. 2009) (remand unnecessary).

the question before the Court is whether or not the defects in the . . . IEP are so significant that [d]efendant failed to offer [the student] a FAPE." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 70 (D.D.C. 2010.)  Accordingly, to prevail on their claims the June 2014 and January 2015 IEPs denied Z.B. a FAPE, plaintiffs must show by a preponderance of the evidence that, at the time each IEP was created, that Z.B.'s placement in DCPS rather than in a full-time special education setting or the program content of the IEP resulted in an IEP that was *not* "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207.

## III.   PLACEMENT IN DCPS DID NOT DENY Z.B. A FAPE

*June 2014 IEP*:  To support their challenge to the placement decision in the June 2014 IEP, plaintiffs rely on the Sanz Report, Dr. Sanz's testimony, Dr. Durham's testimony, and evidence that Z.B. was having a better social experience and making academic progress at the Lab School.  Of this evidence, only the Sanz Report was part of the material available for consideration by the June 2014 IEP team, and plaintiffs' primary argument is that, contrary to the findings of the HOD, placing Z.B. in DCPS was not "consistent" with the Sanz Report.  The record, though, does not support plaintiffs' view.  As is apparent from the Sanz Report, and as Sanz admitted when she testified at the due process hearing (*see* 5/4/15 Tr. at 101), nowhere in the Sanz Report is there an express or even implied recommendation that Z.B. be removed from DCPS and placed in a private school with full-time special education.  Indeed, when the Sanz Report mentions the Lab School, it is only as a possible resource for Z.B.'s parents to consider in order to provide Z.B. with supplementary tutoring.  Sanz did testify, over a year later in May 2015, that, based on her 2014 evaluation, she "would have wanted to see her in a small group specialized setting for all of her core subjects and with additional support throughout the rest of the school day." (5/4/15 Tr. at 87.)  However, not only is this a long after-the-fact interpretation

18

of her report, she still never testified that she had thought placement outside of DCPS was necessary at the time she issued her report or even at the time she testified.  (*See* 5/4/15 Tr. at 8 (approach "could have been implemented in a number of ways," such as "a co-taught setting where she could receive small group as needed across the day").)  Accordingly, the Court sees no obvious inconsistency between the Sanz Report and the placement decision in the June 2014 IEP.

The other evidence cited by plaintiffs includes Dr. Durham's testimony that the placement decision in the June 2014 IEP was not appropriate (*see* 5/4/15 Tr. at 171) and the evidence that Z.B. was making academic progress at the Lab School.  (5/4/15 Tr. at 165; AR 224, 226, 227)).  While the Court does not accept the rigid "snapshot" rule proposed by defendant,[23] it does believe that Dr. Durham's hindsight testimony about the June 2014 IEP, given that she was not part of the process and that she only met Z.B. after her enrollment at the Lab School, where Dr. Durham works, several months after the preparation of the June 2014 IEP, carries little weight against the contemporaneous opinions of the DCPS IEP team members – and its experts (Tick and Oliveros)[24] –that Z.B. would receive a FAPE in DCPS.  (*See* 5/5/15

---

[23] Defendant devotes a great deal of time to arguing that the "snapshot" rule precludes the consideration of any evidence that was not before the IEP team at the time the IEP was adopted. (Def.'s Resp. at 10, 16-17.)  Defendant's reading of the snapshot rule is too broad.  Although "the adequacy of an IEP must be assessed as of the time the IEP was developed, rather than in hindsight," *S.S. ex rel. Shank v. Howard Road Academy*, 585 F. Supp. 2d 56, 66 (D.D.C. 2008), that does not preclude the admission of evidence that post-dates its development.  Rather, such evidence may properly be admitted if it shed lights on whether the IEP was objectively reasonable at the time it was promulgated.

[24] Plaintiffs ask the Court to discount or exclude the expert testimony of DCPS's witnesses (Tick, Oliveros, and Hughes) on the ground that their testimony did not satisfy the requirements for expert testimony found in Federal Rule of Evidence 702 and under the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 597 (1993),  Plaintiffs cite no authority for the proposition that expert testimony in an IDEA administrative due process hearing is governed by these requirements, and at least one appeals court has noted that

Tr. at 39 (Tick)[25]; 5/5/15 Tr. at 181, 188, 192 (Oliveros)).  As for the fact that Z.B. was making

progress at the Lab School, that is both unsurprising and of limited evidentiary value to the

question before the Court, which is not whether placement at the Lab School is appropriate, but

rather whether placement in DCPS is not.  Z.B.'s parents were, of course, fully within their rights

to unilaterally enroll Z.B. at the Lab School, but one consequence of their doing so without first

allowing time for full implementation of the June 2014 IEP is that there is no persuasive

evidence that placing Z.B. in DCPS was *not* a viable option.  Given these facts, the Court

concludes that plaintiffs have not established by a preponderance of the evidence that placing

Z.B. in DCPS in June 2014 resulted in an IEP that was not "reasonably calculated to enable the

child to receive educational benefits."  *Rowley*, 458 U.S. at 207.

    *January 2015 IEP*:  Having concluded that placement in DCPS in June 2014 did not deny

Z.B. a FAPE, the next question is whether the IEP team should have reached a different

conclusion six months later.  Unlike the situation in June 2014, when the IEP team met in

December 2014 to consider revisions to Z.B.'s IEP, the placement issue was front and center.

Z.B.'s parents expressly requested placement at the Lab School, and their attorney provided the

---

"[w]hether *Daubert* applies to IDEA hearings before state administrative agencies is highly questionable."  *H.C. ex rel. M.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, 528 F. App'x 64, 68 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 400 (1971)).  Moreover, even if the Court were to agree with plaintiffs' proposition, the proper time for plaintiffs to raise this issue was before the Hearing Officer.  *See id.* at 68 (district court cannot play gatekeeper role when it is reviewing an administrative record).  Accordingly, the Court will not reject the expert opinions of the DCPS witnesses.

[25] Plaintiffs contend that Tick's testimony should carry little weight because of her "extreme bias" in favor of integration and against full-time special education.  The Court does not view her testimony as evidencing bias, but rather as offering her strong opinion about the benefits of integration.  Of course, she is not alone in this view.  Indeed, the law requires that each student be educated in the "least restrictive environment" that is appropriate.  And, as the record establishes, DCPS is capable of providing up to 26 hours per week of special education and related services.

IEP team with evidence from the Lab School that supported their request, including the Lab

School's IEP, evidence that Z.B. was making progress at the Lab School, although her

behavioral problems remained significant, and Dr. Durham's opinion that removal from DCPS

was necessary.  Plaintiffs rely on this evidence, with the additional support of Dr. Durham's

testimony at the hearing, to argue that placement in DCPS in January 2015 denied Z.B. a FAPE.

Countering the Lab School evidence, both at the time the January 2015 IEP was adopted and as

reiterated at the hearing, are the opinions of Tick and Oliveros, two members of the DCPS IEP

team who continued to believe that removal from DCPS was not necessary.  What the record is

lacking, especially considering the timing of Z.B.'s removal from DCPS, is any persuasive

evidence that keeping Z.B. in DCPS was not a viable option.

While Z.B. is no doubt receiving a "better" education at the Lab School than she would

have at DCPS; the Lab School, after all, is an expensive private school that educates only

students with disabilities and is well known for the quality of its education.  However, that is not

the legal standard that must be applied to decide whether removal from a public school system is

appropriate within the meaning of the IDEA.  Rather, the question is whether removing Z.B.

from DCPS is necessary to provide her with an education that is "reasonably calculated to enable

the child to receive educational benefits."  *Rowley*, 458 U.S. at 207.  Making that determination

is particularly complicated where, as here, the public school system had an IEP in place in June

2014, but the parents made the unilateral decision almost immediately to remove their child from

the public school system so that the proposed IEP was never implemented.  In addition, by

bailing out before the IEP was implemented, and before the District ever had an opportunity to

respond to the parents' objections, which were never even the subject of discussion with DCPS

in either an informal or formal setting, one cannot conclude that placement in DCPS was not a

viable option.  And, as previously discussed, the fact that Z.B. is making progress at the Lab School is not persuasive evidence that placement in DCPS would not have worked.

The Court of Appeals' recent decision in *Leggett*, which ordered DCPS to reimburse a parent who unilaterally withdrew her child from DCPS, is easily distinguishable.  In *Leggett*, the child's parent made the first request to have her child evaluated for learning disabilities in the fall of 2009, yet DCPS, although it agreed to perform an evaluation, failed to conduct an evaluation that year, the next year, or by the start of the following year.  793 F.3d at 64.  Halfway through the 2011-12 school year, due to continuing and very serious academic and other issues, the parent again asked for an evaluation; this time DCPS refused, telling her to pay for a private assessment.  *Id*.  The parent immediately filed a due process complaint, which spurred DCPS officials to agree to undertake the necessary testing.  *Id*. at 64-65.  After the testing was completed, though, DCPS still failed to have an IEP in place before the start of the 2012-13 school year.  *Id*. at 65.  The parent made multiple attempts over the summer to find out if an IEP would be finalized, but, having heard nothing, decided to enroll her child in the only private school she could find that would accept her and to file a new due process complaint, all the while making clear that she were willing to return to DCPS if an appropriate IEP were forthcoming. *Id*. at 65-66.  DCPS managed to come up with an IEP about a month into the school year, but it was, according to the parent, "riddled with errors" and lacking necessary special education programs.  *Id*. at 66.  The Court of Appeals found that the procedural violation of not having an IEP in place at the start of the school year clearly carried substantive consequences as the child would be without any special education services, and as a result, DCPS had failed to provide the student with a FAPE.  *Id*. at 68.  The Court also rejected DCPS's attempt to blame the delay on the parent, finding that with no IEP in place she really had no other viable option other than to

place her child in the only private school that she had found that could meet her needs.  *Id.* at 68-69.  But the Court of Appeals in *Leggett* did not need to reach the question of whether alleged inadequacies in the IEP that was eventually adopted would have independently constituted the denial of a FAPE.

Here the situation is dramatically different.  There was a timely IEP prepared in June 2014 that called for the provision of special education services and the parents did not offer any specific objections to the IEP or invoke their administrative rights to challenge it before withdrawing from DCPS.  Instead, they made the unilateral decision to move Z.B. before the IEP was even implemented and then argued at a due process hearing in May 2015, after Z.B. had been at the Lab School for almost a full school year, that a private school was the only appropriate placement.  In fact, plaintiffs' lawyer told the IEP team in January 2015 that unless DCPS changed the placement to provide Z.B. with a full-time, special- education placement, the parents would reject the IEP.  In addition the parents did not want their child at Hearst because she had been subjected to bullying, and the father considered the local option as unacceptable because it was a failing school.  (AR 491.)  In contrast, in *Leggett*, the Court emphasized that it was "[c]ritical for our purposes . . . [that the parent's] communication [with the school] made clear that she 'remained open to the possibility that [the child] could return to [DCPS] if the school offered her a satisfactory IEP."  *Leggett*, 793 F.3d at 66.  So unlike *Leggett* and others cases[26] where no IEP was in place, here there was an IEP in place, and while it might not have been flawless, it did recognize the child's educational needs, provided special education services,

_____

[26] *See, e.g.*, *Alfono v. District of Columbia*, 422 F. Supp. 2d 1, 8 (D.D.C. 2006) (incomplete IEP at start of school year denied student a FAPE); *N.S. ex rel. Stein*, 709 F. Supp. 2d at 70 (IEP was "effectively incomplete" and thus denied student a FAPE).

and it satisfied the standard set forth in *Rowley* in that it was reasonably calculated to enable the child to receive educational benefits.

Finally, there are strong policy considerations that counsel against allowing parents to unilaterally place a child in private school before giving the public school a chance to implement their IEP or to even adjust it in response to parental complaints, and to then permit parents to override the placement determination of the public school's IEP team based on the child's subsequent success at the specialized school and the opinions of experts associated with that school. As the First Circuit has observed, "the underlying judgment of those framing the [IEP] is given considerable weight. The standard of review is thus deferential to the educational authorities, who have primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs." *See Lessard*, 592 F.3d at 270. Moreover, such an outcome would be inconsistent with the purposes of the IDEA, costly for the public school system, and fundamentally unfair to the many children whose parents lack the financial resources to take that risk. In addition, it invites parents to flee the public school upon the completion of one IEP without invoking the administrative process provided by the IDEA until many months after the child has matriculated at what many would agree is the best available private non-residential school (and probably the most expensive one) in the District. In the end, given the particular facts of this case, the Court concludes that plaintiffs have not established by a preponderance of the evidence that the January 2015 IEP should have removed Z.B. from DCPS and placed her in full-time special education.

Accordingly, the Court rejects plaintiffs' claims that the placement decisions in the June 2014 and January 2015 IEP denied her a FAPE.

## IV.   PROGRAM CONTENT OF IEPS DID NOT DENY Z.B. A FAPE

Having concluded that plaintiffs have not shown that placing Z.B. in DCPS in June 2014

or January 2015 denied her a FAPE, the Court must consider whether plaintiffs' challenges to the substantive content of either IEP have merit.

*June 2014 IEP*:  Plaintiffs contend that the June 2014 IEP was inappropriate because it included inappropriate math and writing goals, lacked reading and executive functioning goals, lacked goals and services that would have been included had it timely assessed Z.B.'s need for behavioral interventions and occupational therapy, and contained insufficient hours of specialized education.

There is evidence that supports plaintiffs' specific criticisms of the June 2014 IEP.  For example, Sanz testified that the June 2014 IEP was inconsistent with her report in several respects:  it misinterpreted one of the written expression scores (5/4/15 Tr. at 71-72); it did not take into account Z.B.'s specific learning disabilities in math and written expression – only her ADHD (5/4/15 Tr. at 78, 80); it set inappropriately high goals in math (5/4/15 Tr. at 79); it only provided for help in written expression within the general education setting (5/4/15 Tr. at 82); it did not take into account the "complexity" of her social/emotional/behavioral problems (5/4/15 Tr. at 81); and it lacked executive functioning goals.  (5/4/15 Tr. at 84.)  However, when Sanz was asked about these inconsistencies, her recommendations for how the June 2014 should have been altered were quite limited, and her testimony does not suggest that these inconsistencies were fatal flaws.  For example, she testified that she: "*might have* included some goals for reading comprehension (5/4/15 Tr. at 85); "*would have liked to have seen* some further evaluation of reading skills to see if goals for phonological awareness were warranted and also occupational therapy"; "*might have* added some additional push-in support or support within the classroom for her behaviors as well" (5/4/15 Tr. at 85); and in terms of the hours of service, Z.B. "*might need* a little bit more than that."  (5/4/15 Tr. at 86-87.)  Considering this testimony, the

Court does not see any fatal inconsistencies between the Sanz Report and the June 2014 IEP.

Dr. Durham testified that the June 2014 IEP had inappropriate math goals (5/4/15 Tr. at 158), lacked needed goals in reading (5/4/2015 at 159), and provided too few hours of special education (5/4/15 Tr. at 160), but, for the reasons previously discussed, her hindsight testimony about the appropriateness of the June 2014 IEP carries relatively little weight.  In addition, her opinion is countered by Tick and Oliveros (*see* 5/5/15 Tr. at 39 (Tick); 5/5/15 Tr. at 192 (Oliveros)), who also explained that the IEP team made the decision not to include reading goals because Z.B.'s reading was in the average range (5/5/15 Tr. at 99 (Tick); 5/5/15 Tr. at 220, 237 (Oliveros)[27]), a conclusion that is supported by record evidence, including the Sanz Report. Finally, her opinion that there were "insufficient" service hours in the June 2014 IEP, without offering as any specifics, also fails to establish any fatal flaws in the June 2014 IEP.

Finally, Dr. Chang, who is also affiliated with the Lab School, testified that the June 2014 IEP lacked necessary occupational therapy services.  However, the absence of occupational therapy services, especially given the short time frame between the eligibility determination and the adoption of the initial IEP, does not render the IEP inappropriate.  The Court reaches the same conclusion as to the lack of an express "executive functioning" goal, especially given the information that was available at the time.

The June 2014 IEP may not have been perfect, but that does not mean that it was inadequate.  An IEP is not a static document.  Rather than raising these issues at the time the June 2014 IEP was adopted and giving DCPS a chance to address them, Z.B.'s parents withdrew

---

[27] Oliveros further explained that math was included as an area of concern while reading was not because Z.B.'s reading test scores, unlike math, were not below average, and Z.B. had more need in math than reading.  (5/5/15 Tr. at 211, 220, 237.)

her from DCPS and enrolled her at the Lab School.  Moreover, when DCPS conducted its annual review and was made aware of these issues, it agreed to all of plaintiffs' proposed changes short of their request for full-time special education.  In the Court's view, this is precisely how the IEP process is supposed to work and the reason why flaws in an IEP must be "significant" before it can be considered inadequate.  *N.S. ex rel. Stein*, 709 F. Supp. 2d at 70; *see also Tindell v. Evansville-Vanderburgh Sch. Corp.*, 805 F. Supp. 2d 630, 647 (S.D. Ind. 2011) (IEP not denial of FAPE where record did not show that it had "significant flaws that prevented [the student] from receiving the benefit of the services provided for therein").

*January 2015 IEP*:  As noted, the January 2015 IEP, as amended in April 2015, addressed almost all of plaintiffs' complaints about the substantive content of the June 2014 IEP. The only remaining challenge is a claim that the January 2015 IEP provides for insufficient service hours.  Although that is theoretically a different claim than their challenge to placement in DCPS, which the Court has already rejected, as was the case with the June 2014 IEP, they have made no serious attempt to distinguish it.  Dr. Durham testified that authorized hours of special education "remained insufficient" (5/4/15 Tr. at 160), but her testimony included no specifics.  .  This vague critique is not enough to establish that the number of service hours even constituted a flaw in the January 2015 IEP, much less that the single alleged defect was "so significant" that it denied Z.B. a FAPE.  *N.S. ex rel. Stein*, 709 F. Supp. 2d at 70.

Accordingly, the Court rejects plaintiffs' claims that the program content in the June 2014 and January 2015 IEPs rendered those IEPs inadequate and denied her a FAPE.

## V.   REIMBURSEMENT

Having concluded that neither the June 2014 nor January 2015 IEPs denied Z.B. a FAPE, plaintiffs are not eligible for reimbursement for Z.B.'s attendance at the Lab School or for an order directing DCPS to place and fund Z.B.'s attendance there in the future.

## CONCLUSION

As the Court has concluded that neither the June 2014 nor the January 2015 IEP denied plaintiff a FAPE, plaintiffs' motion for summary judgment will be denied and defendant's motion for summary judgment will be granted.  A separate Order accompanies this Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date: August 24, 2016